My name is Juliette Clark. I'm an assistant district attorney. I'm representing Burl Cain in this matter which is an appeal from a habeas corpus decision granting habeas relief. Patrick Kennedy was granted habeas corpus relief. He is a state court prisoner. He was indicted by a grand jury that was comprised of 5 out of 13 being women. One of the actual grand jurors was selected by the judge during the time period when the judge would select the foreperson not from amongst the randomly selected other 4 people but from the venire. He was convicted by a jury of 10 women and 2 men, conversely, but he was convicted of aggravated rape of his 8-year-old stepdaughter and sentenced to life imprisonment. The district court found that the Louisiana Fifth Circuit decision was objectively unreasonable, that it wasn't entitled to deference. In this case, there were absolute disparities that were shown as ranging between 13.4% and 17.41% depending upon the population that was used. And the district court, citing to this court's decision in Mosley, stated that this honorable court had concluded that the Supreme Court had concluded that those percentages were per se evidence of prima facie evidence of discrimination in any and all cases. And so she found that habeas relief was warranted and granted relief. The state appealed in this matter. One of the issues that's come up in this case is, obviously, do those percentages, are they, has the Supreme Court held that those percentages are prima facie evidence of discrimination in all cases? Once that number is there, is that it? Is that evidence of discrimination? Did you discuss the probability statistics before Judge Berrigan, corpora? No, Your Honor. In Judge Berrigan's court, there was no evidentiary hearing. There was an evidentiary hearing in the state court over 10 years ago. And in that hearing, the evidence that was presented by the defense was of population statistics, of absolute disparities, of comparative disparities. There was a probability calculation that was performed by their expert that they called. In a memorandum that was submitted in evidence by him, he calculated probabilities based upon 36 grand jury selections when the court had concluded that only 19, a 10-year period, was the relevant period to be examined. So the calculations that he derived with regard to the probability don't really apply anymore. I recalculated them using the same formula he did, which it appears to be a kind of a variety of binomial distribution and probability merged. But calculating it that way, I came up with a result of 1 out of 11 for 7 out of 19 grand jurors, whereas he came up with a number of 1 out of 1,200 something based upon one population statistic and 1 out of 1,400 something based upon another population statistic. So he was recalculating it based on 36 grand juries, not on the 19 that were held to be relevant. The actual range is not an issue here. This court has already denied a Certificate of Appealability on the question of whether or not the 19 grand juries, the 10-year period, was the relevant period, whether that could be elapsed. So the question here in terms of probabilities, no other probabilities were presented during that hearing other than some calculations that the expert made while testifying that had to do with how likely it was that a male juror would select a female judge who would select a male grand juror. So it didn't really speak beyond what I've already said. It didn't speak to the issue of probabilities. I mean, there are other probability tests that could be conducted. The question, though, with that is they're apparently difficult to conduct because the sample is less than 20. I actually, in the last week, tried myself to perform the one and two-tail testing, but I ran into a problem because the standard deviation apparently can't be conducted using, I guess, a normal formula where you use other estimates. You have to calculate it out differently in a manner which I really cannot figure out how to do. But in terms of, I did want to compare the absolute disparities because, in this case, one of the questions has been, can we really compare the absolute disparities in this case? Are they really comparable to the absolute disparities that, you know, just on their face are similar in the Supreme Court cases where they've granted relief? And they're really not. They really, what I did is I went through and I worked out an example to show how they're not and to show just how significant the difference that the small sample makes when you use the absolute disparities. For example, in this case, 7 out of the 19 grand jury forepersons were women. So I asked myself, well, if we changed one of those, if we changed it to 8, how much would the percentages, how much would the absolute disparities change? So calculating the percentage, if there were 8 women instead of 7, there was a difference in the, I'm sorry, a difference in the percentage of 5.3%. And that took, that would have resulted in absolute disparities 5.3% lower on all, you know, on all population estimates and would range from 8.09 to 12.1. Now, next I looked at Wittes and I said, well, in Wittes, Wittes was a jury venire comparison. It wasn't, and here we're looking at grand jury forepersons, we're looking at 19, a sample size of 19. In Wittes, they were looking at a jury venire and it was a sample size of 33. There were 3 African Americans on that venire. Looking at that to see what would happen if we changed one of those to 4, changed one of those and made it 4 out of 33, I got a difference of 3%. So the absolute disparities in that case would change from 18.1% to 15.1%. But in that case, again, it was a venire case, they looked at a lot of different things and they worked it all the way down to how many people actually sat on the jury. And the numbers were extreme, you know, on all fronts, I guess I would say. In Turner v. Foosh, the numbers, it was a grand jury list. So the numbers were 304 people on that list and out of them, 113 were African American. If you change one of those to 114, the difference, the difference in the percentage that's calculated becomes 0.4%. So that's 0.4%. So at that point, the absolute disparities, they become negligible because the absolute disparity under the first calculation is 22.9% but the changing just one juror only changes that percentage to 22.5%. So in both cases, they wind up being, you know, basically 23%. And then last look at Jones v. Georgia, the actual underlying information was not in the Supreme Court case but if you backtrack into the appellate court case to see what the numbers, what the calculation was based upon, it was a jury list that had 5,665 people on it. And out of that number, the 5%, African Americans represented 285 out of that list of 565 people. In that case, when you calculate the percentages there, the differential is like 0.0001765. So what I'm trying to say is these cases are cases, especially Turner, Jones, I couldn't calculate in SIMS because I couldn't find the rest of the data but it was also in jury list cases. But in those jury list cases, we're looking at cases where the sample size is very large. And in cases where the sample size is very large, adding and subtracting one person at some point, it doesn't change the results very much at all. And you have to basically, in those cases, several people have to be added or subtracted in order to change the result, even a percentage point. Clark, all of this is interesting I guess but it reminds me of the old very famous book How to Lie with Statistics. Right. And I think we would like to hear about what at least I think is the most important part of this case.  Well, I'll start with you, because you have your best possibility, and that's EDPA. For the Louisiana Fifth Circuit. You Honor, I think the one thing that all these numbers show is that the Louisiana Fifth Circuit Court of Appeal did not unreasonably apply actual controlling Supreme Court jurisprudence when it looked at the numbers in this case. It had absolute disparities in front of it. It had comparative disparities in front of it. And when it looked at these numbers, it also took into account the fact that this was a small sample size. The District Court's decision was based upon a finding that this Court had determined that the Supreme Court had set these numbers, I guess in stone, that if I can calculate an absolute disparity that hits this number, if I can calculate an absolute disparity that hits that number based on some population, that's enough. That's all they have to do. And then no deference is, the Court of Appeal in the State Court is not entitled to any deference at all. And that's not the case. And I think that here, especially considering the small sample size, first of all, the Supreme Court has never said this particular number or that particular number. In each one of these cases, they were looking at circumstances where African Americans were overwhelming degrees. And if you go to like Alexander versus Louisiana, there were repeated instances where the jury wheel was called. And you would have circumstances where you would take a significant percentage of the population and pull it down to nothing. So the Supreme Court in those cases, they never said 14% is always going to be a prima facie case. They never said 17% will always be a prima facie case in every instance. What they were doing is they were looking at those numbers in a particular context with a particular population, and they were determining that a prima facie case had been made. Now, applying the same sort of principles to this case, you were looking at a case where the defendant, significant or not, went on to be tried by a jury that had 10 women on it. I find it hard to believe that in any circumstance his conviction should be set aside because on a sample of 19 based upon one or two, a fluctuation of one, two, or three people, where each one of those people represents 5.3% of the number. The other side is that you've got 10 years of every grand jury in the parish, and you have over 50% female representation on every one of the three statistics, except when it is over a third. I mean, it's counterintuitive for there not to be a problem there. Well, Judge, if you look at the number of randomly selected jurors in this case, it was less than 50%. I mean, it was 5 out of 12. I mean, it's not always going to be the same. In chance, when you flip the coin, in all these examples, they talk about flipping the coin. What's the chance that the next one is going to come up a different thing? We're not just, it's not just a question of, you know, is this the most, you know, the result that most correctly represents the population? There has got to be some allowance for chance, and in this circumstance, I would argue that 7 out of 19, given the small sample and the difference that any one person makes to the sample size, given the Louisiana Fifth Compared different types of disparities to try and find out, what does this really mean? They could not conclude, and frankly, you know, the United States Supreme Court has never said that this result is compelled. So I think that in a circumstance where the state court has fairly, has fully, has made an effort to comply with the Supreme Court's jurisprudence, who's identified the correct legal governing principle, who's analyzed it thoroughly, that it, it shouldn't be, it should not be denied deference simply because there is a case where, you know, the Supreme Court has found that someone had made a primate facial showing based upon a particular absolute disparity, when in fact, in a comparison of the cases, shows how disparate the things that are being compared are, you know, in the, these 19 four persons to, you know, lists of 5,000 people or a list of 300 people, you know, or even 33 people. So, again, I would argue that the, that the state court's decision is entitled to deference and that it did not objectively, unreasonably apply the state  So, with that, if you have any questions, I'll, I'll go. All right. Thank you. You saved some time for rebuttal. Ms. Cappell. May it please the Court. Cecilia Cappell on behalf of Patrick Kennedy. Ms. Cappell, what's a letter brief? What is a letter brief? I looked at this Court's rules and what, I didn't see anything specifically laying out what a letter brief was, and so. It's not a brief, it's a letter. I'm, I'm sorry that I submitted a regular brief, but I, I hope it complied with what this. You can always call the clerk of court and ask. Okay. Okay. Thank you. I apologize. The district court in this case properly held that the state court of appeal unreasonably applied, clearly established Supreme Court law by confronting facts which were materially indistinguishable with relevant Supreme Court precedent, but arriving at the opposite result. The state court of appeal in this case considered a 14 to 18 percent absolute disparity, which is on point with Supreme Court law holding that that level of disparity is enough to make out a prima facie case, but the state court here held that Mr. Kennedy had failed to make out a prima facie case. And before I get into my argument today, I do want to address the question of the burden of proof. The Supreme Court has never held that the defense burden was to prove beyond all doubt that intentional discrimination occurred. At the prima facie stage, it is the defense's burden to raise an inference of discrimination. And that inference is raised under Castaneda and under Rose by pointing to the degree of disparity between the proportion of the group in the population and the proportion of the group selected as foreman. And so the Supreme Court speaks to the amount of disparity, and that amount can be used to raise an inference. It is the state's burden in rebuttal to show that chance explained that disparity. And the way that the state does this is by pointing to neutral selection criteria, and that is to say that we have a procedure in place where we use these criteria to select grand jury forepersons, and so this disparity must be due to chance. And that is the evidence that is properly before the court at the rebuttal stage and not at the prima facie stage. So these questions about the probability of this result occurring by chance are properly addressed at the rebuttal stage. In this case, this is a review of the State Court of Appeals judgment in light of the evidence before it. Mr. Kennedy presented evidence to the state court, and this evidence was admitted by the district court, and the state did not object, and in fact the state stipulated to the accuracy of the underlying data that Mr. Kennedy presented. He presented evidence that nine of 36 forepersons in the past 19 years had been women. That was 25%. He presented evidence that 54% of the registered voters in Jefferson Parish were women, 52% of the general population was female, and this was almost a 30% absolute disparity. Mr. Kennedy presented an expert witness who testified that the probability that you see this result due to chance was 1 in 1,426. The state did not contest this evidence and instead argued that under a more limited 10-year period there wasn't enough disparity. The state district court rejected this and found that Mr. Kennedy had found, had submitted a prima facie case and ordered the state to put on a rebuttal. The state's rebuttal evidence consisted of one witness who was a former prosecutor who had been in charge of assisting with the selection of forepersons between the late 1970s and 1996 when he left that position. He testified that there were no official selection criteria. He testified that they were looking for somebody who was a little bit more than literate, that he would rely heavily on volunteers who were primarily white males and that he would supplement those volunteers with other individuals who he thought looked like they would be capable of organizing a grand jury. He testified that because he was aware that these numbers would be looked at at some point in the future, ostensibly through a discrimination challenge, he would try to include additional minorities in the group that he submitted to the judge. Now he acknowledged that he did not make these decisions, that the selections were ultimately only made by the district judge. The Louisiana Supreme Court has held that this selection procedure had the effect of limiting the selection of forepersons to a group made up predominantly of white men. The state court of appeal in this case acknowledged that this was an insufficient rebuttal, but the court found that Mr. Kennedy had failed to make out a prima facie case. This decision was objectively unreasonable for three reasons. The test that the court used, the disparity that the court considered, and the underlying mathematical error that was made by the court of appeal here. First, instead of following the test that was clearly articulated in Castaneda and Rose, the state court of appeals took its own path and applied conditions on Mr. Kennedy, which raised the bar that was established by Castaneda. Castaneda announced the three-step test to determine whether a prima facie case has been made, and Rose versus Mitchell modified this to suit a grand jury foreperson challenge. The only disputed component of this test was the second prong, which was substantial under-representation. The Castaneda-Rose test, as I noted before, allows the defense to satisfy his burden by showing the degree of under-representation by comparing the proportion of this group in the population to the proportion of this group that is selected. In this case, Mr. Kennedy presented evidence that nine of 36, 25 percent, had been women, that even considering only the preceding ten years, it was seven out of 19, and in fact Mr. Kennedy presented 37 forepersons. One was selected after he was indicted, who was a man. And so, considering only the ten-year period. At least on the point of whether ten years or 19 years is the appropriate representative period, would that part of the opinion of the decision by the court of appeal be entitled to deference? Mr. Kennedy presented a prima facie case, whether we're considering a ten-year period or a 19-year period. Well, it is. In either way, can you answer my question? Where the state court of appeals decision was unreasonable. What is this time period supposed to reflect? Why don't you answer that way. What would be the relevant time period? We can go back 50 years and have a larger selection of grand jurors and people in charge of grand juries, but that may not be a fair assessment from Louisiana's viewpoint because the procedures have changed through the years as the case law has developed. The state court of appeals decided that ten years was the right period, factoring in whether that best caught what was going on at the time that Mr. Kennedy's grand jury was named. It sounds like epideference unless there's a Supreme Court case that says you can't do that. I'm not here contesting that ten-year period. I'm simply noting the evidence that was put on before the court. Now, how the state court of appeals went wrong is they moved the goal posts. Mr. Kennedy presented the 36 years. The state court of appeals, rightly or wrongly, considered 19. And then they considered that fact against Mr. Kennedy because they said 19 was not enough. So that is how the state court of appeal unreasonably applied Casaneda because there is no totality of circumstances analysis under the second prong of Casaneda. Casaneda only asked a defendant to show a disparity. The 14 to 18 percent disparity the state court of appeal here found was significant. And the inquiry should have ended right there under Casaneda and Rose. But instead, the court goes and moves the goal posts and imposed these other factors on Mr. Kennedy to determine a prima facie case, including the fact that only 19 grand juries were considered, the fact that only ten years were considered. These two facts were of the state court of appeals' own making because the state court of appeals decided to consider those ten years. If the court was not satisfied with that ten-year period, the court could have relied on the evidence that was submitted by Mr. Kennedy and indeed admitted by the state district judge. And it was accurate. It was undisputably accurate. And if the court wanted to consider 20, if 19 was not enough, the court could have considered that many. But what the court did was confront the fact that the defense put on 36, four persons, narrow that number to 19, and then say, 19 wasn't enough, so you haven't satisfied your burden. And that is the heart of the unreasonableness of that opinion. And it's directly contrary. Again, I'm not trying necessarily to defend the court of appeal, but it seems to me they're saying that the ten years were the relevant time period. And whether it's a valid assessment or not, having such a few number of grand juries skewed the integrity of the percentages just because of the small numbers. And to add more years is to add years that they found were not as relevant in figuring out whether, in fact, there was intentional discrimination going on. So it's a tough choice, but it's a choice based, I think, potentially, the court will have to assess such things, on guidance from the Supreme Court that may not have said that was improper. They may not be controlling precedents to say you can't do it that way. I do want to note that I want to direct the court to the transcript of the hearing in this case because the evidence before the State Court. Which transcript? I'm sorry. The transcript of the motion to quash hearing before the State District Court in January of 2012. The State's witness testified that this selection procedure was in effect for the entire 20-year period. And he left that position in 1996, but throughout the time that he was there, this was the procedure. There was no evidence that the procedure had changed or improved in any way. And there was only evidence that he had attempted to add more minorities at some point to ward off challenges of discrimination. But the disparity, even considering this 10-year period, the disparity is 14 to 18%. And the question of what level of disparity qualifies as substantial has been answered resoundingly by the U.S. Supreme Court. Jones v. Georgia, 14.7%. Sims was 19 and 14.6%. Whitus, 18%. And Alexander v. Louisiana, 14 to 16%. And in Alexander, which was decided five years before Castaneda, the court said that this 14 to 16% disparity was significant. But it didn't rest its decision on that disparity because there was a selection procedure that was susceptible of abuse. And in this case, of course, we do have a selection procedure that was susceptible to abuse. It relied on the untrammeled discretion of the district judge to select these four persons. And so we meet that prong, just as the defendant did in Alexander. Now, all of these cases that I've just referenced were cited to in Castaneda for the proposition that this is the level of disparity that satisfies the second prong of the prima facie case. If this level was good enough for the U.S. Supreme Court, it should have been good enough for the Louisiana Fifth Circuit Court of Appeal. And this is just the prima facie case. The state could have rebutted this, but the state didn't. The state could have reindicted Mr. Kennedy because the Louisiana legislature had already corrected this procedure at the time we had this hearing, but they didn't. Now, this range of disparity was just simply not up for debate at the prima facie stage. Maybe a 9% or a 10% may have been up for debate, but once the Supreme Court has identified a level of disparity, which is significant under Castaneda and Rose, that ends the debate. Jones said 14. Widas said 18. We had 14 to 18 here, and that should have ended the debate. And finally, I do want to talk a little bit about this unreasonable determination of the facts that the state court of appeal made in its analysis. The decision of the state court of appeal, the court says it is relying on the population baseline of 50.2%, and the court says that it is using the number of randomly selected grand jurors during the time period of 1988 to 1998 as the baseline. The court could have used the number of eligible women in the community, which was 54%. The court chose to use the number of randomly selected grand jurors. But what the court did was to take the number of randomly selected grand jurors during this time period, add to that the number of non-randomly selected forepersons during that period, which was 19, and that had the effect of skewing the data towards male jurors because the number of forepersons, overwhelmingly, was male. And so instead of the 50.2% figure, the actual percentage of women randomly selected during that time period was 51.4%. And so the state court of appeals figure of a 13.4% absolute disparity was simply incorrect based on the evidence that was submitted for it. And if the court had actually used the percentage of women who were randomly selected during that time period, the number would have been 14.6%. And it's almost exactly the same number that the U.S. Supreme Court found to be significant in Jones v. Georgia, which was 14.7%. And at this point, the state has only appealed the district court's EDPA determination under 2254 D.1. And I do think that the calculations that were being made would have been appropriate in rebuttal. The state chose not to present statistical evidence in rebuttal before the state court, and there was no hearing in the district court. And so what we have is the evidence that was submitted in the state court. And under that evidence, there was a 1 in 1,426 probability that this disparity was due to chance, and that's considering the full complement of the data that was submitted by Mr. Kennedy. And this data was accurate, as the state stipulated to. The state court of appeal could not have rejected this evidence without unreasonably applying controlling Supreme Court precedent. And the state district court questioned Mr. Kennedy's expert at the hearing about the likelihood that we would see this result due to chance. After the parties had questioned this expert, the court said, I'm going to question you personally. And he said, what is the probability that you see this result during the 10-year period due to chance? Mr. Kennedy's expert said, I think that this speaks to a departure from randomness. And that is all that is required to pose an inference of discrimination under Castaneda. Does the Woodfox decision assist us in any way, or is it just duplicative of what you've been arguing already? I think that it supports the principle that once the Supreme Court has identified a level of disparity which constitutes substantial under-representation under Castaneda and Rose's second prong, that stands as clearly established law that our state courts must comply by. In Woodfox, this court found that the Supreme Court had specifically allowed these levels of disparity to make out a prima facie case of discrimination, including 14.7 percent, 18 percent, 19 percent. Once the Supreme Court has set that level as the level that constitutes a prima facie case, then if Mr. Kennedy is able to meet that level as a matter of clearly established law, he's made out his prima facie case. And this court held in Woodfox that based on those figures, the disparities before the state court in Woodfox could not have been rejected without being an unreasonable application of clearly established Supreme Court law. And in Woodfox, I don't believe there was a hearing before the state court. It was evidence that was submitted in post-conviction on paper. And in this case, I believe we have an even stronger situation because this was evidence that was fully put on before the state courts. This was evidence that the state district judge found made out a prima facie case. And I think that based on the disparities that were clearly laid out by the U.S. Supreme Court and its precedent in Castaneda and the other cases that I've referenced, the disparities in this case fit within that range. And the state court's rejection of that prima facie case was objectively unreasonable. And I do want to very briefly address the state's principal complainant's brief that the district court unreasonably or incorrectly relied on this court's decision in Mosley. This court in Mosley v. Drecke wasn't breaking any new ground. This court simply identified the existing Supreme Court precedent at the time, which was in 2004, and this court specifically noted that the Supreme Court has found substantial underrepresentation at levels of 19.7 and 14.5 percent in Sims v. Georgia and Jones v. Georgia. And in Rideau v. Whitley, this court had applied this controlling precedent to find a prima facie case at a level of 11 to 13 percent. And the district court in this case entirely properly looked to this court's jurisprudence to the extent that it highlighted the then-existing state of Supreme Court law at the time Mr. Kennedy's conviction became final. Unless there are any further questions, we would ask that this court affirm the ruling of the district court below. Thank you. Thank you. All right, Ms. Clark, you've saved time for rebuttal, and rebuttal is just for rebuttal. The defendant has argued that, again, that 14 percent, 14 through 18, have been identified by the Supreme Court as that once you meet that test, that means that you have made a prima facie showing. The Supreme Court has never said that in all cases a 14 percent or in all cases an 18 percent or in all cases a 16 percent showing will make a prima facie case. And the reason for that is likely because mathematically, those percentages mean different things when you are looking at different groups. Sometimes those percentages, as I was trying to show earlier with the argument, sometimes those percentages are more significant if the sample size is small. Now, the question in terms of, you know, the defense also argued, well, you know, the state court was unreasonable because it limited us to 10 years and then said we should have shown more juries. That's not exactly correct because the 10-year period, as the Court noted, was that was a relevant, significant period for purposes of determining what, you know, the level, you know, whether there was discrimination or not. That was a significant period. The question of the jury, of the selections, of the sample size, is something different. One, you're looking at a time period, and the other, you're looking at samples. When you are looking at a certain population of samples, you know, in this case 19, in some of the other cases we talked about, you know, a certain 5,000 selections or out of 300 selections, those selections, those independent selections, the number of them means that when you're looking at those disparities, they mean something different. And I think that that's part of the reason why some people have argued that, you know, absolute disparities shouldn't be used in certain cases because if you have a small enough minority population and you apply that 10% is always too low rule, you'll just, you know, wipe them off the map and you don't have to have any. Again, the Supreme Court has never said that these are set in stone. In this case, the determination that 10 years was a relevant period was a completely reasonable determination. It was not an unreasonable application of clearly established Supreme Court jurisprudence or an actual holding as opposed to dicta inside of their decisions. And mostly be direct key, I remember correctly, the Court, it was actually the amount was under 9%, so the Court wasn't, in noting those statistics, the Court wasn't relying upon them to grant relief or to find a prima facie case had been made. The Court just noted them in terms of noting the prima facie case had not been made in that case. And then finally, I wanted to note that this, okay, I've already covered the moving the post thing, I'm sorry. It's not objectively unreasonable to take into account the small sample size. As I said, mathematical numbers, they mean different things. We can't, you can't, 14% does not mean the same thing in terms of the inference. When the sample size is small, it exaggerates disparities. Oh, and the Court had mentioned Woodfox and Woodfox. I cannot remember exactly the number of selections, but I believe it was somewhere in the 20s. It was based upon a longer period of time. It was a case in which there was no epidefference. It was not entitled to any epidefference. And there were lengthy hearings held in the District Court in which, in analyzing whether or not those percentages were significant in Woodfox, the Court did examine things like the two-tailed testings and things that were done in the District Court, but ultimately concluded that the results didn't, I don't know how to express that mathematically, but ultimately concluded that the p-values that were generated by those tests were not such that it would kind of dispel the inference of discrimination in those cases. It was not a random, you know, the likelihood that it was random was not past the critical value in the calculation. The State submits that the appeals decision should be overturned. It relied upon, it did not correctly find that those percentages compelled or rendered the State Court's decision objectively unreasonable. All right. Thank you.